## 213 W. 23rd St. LLC v Crunch Holdings LLC

2025 NY Slip Op 31475(U)

April 25, 2025

Supreme Court, New York County

Docket Number: Index No. 652882/2022

Judge: Sabrina Kraus

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:   **HON. SABRINA KRAUS**

*Justice*

---------------------------------------------------------------------------------X

213 WEST 23RD STREET LLC,

                    Plaintiff,

              - v -

CRUNCH HOLDINGS LLC, CRUNCH WEST 23RD
STREET, LLC

                    Defendants.

---------------------------------------------------------------------------------X

PART      57M

INDEX NO.    652882/2022

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff commenced this action against CRUNCH WEST 23RD STREET, LLC ("Tenant") for breach of a lease, and against CRUNCH HOLDINGS LLC ("Guarantor") for alleged breach of a limited form of guaranty common in commercial real estate leasing called a "Good Guy Guaranty."

On December 14, 2023, Justice Arlene Bluth issued a decision granting defendants' motion for spoilation sanctions, as Mitchell Marks ("Marks"), Plaintiff's Managing Member, acknowledged deleting many emails relevant to the underlying issues in this action, with no coherent explanation for doing so. Justice Bluth held:

> There is no dispute here that plaintiff destroyed documents.
>
> And plaintiff's principal, Mr. Marks, admits that he destroyed documents. He insisted that plaintiff has no other documents "because Plaintiff did not retain every communication between Plaintiff and Defendant during the parties' multi-year working relationship". Mr. Marks complains that he is flooded with hundreds of emails a day and so he deletes emails.
>
> Unfortunately, this explanation is wholly unsatisfactory. Plaintiff is a sophisticated landlord that is seeking to recover over $1 million from defendants. A vague assertion

1

[* 1]

that its principal gets too many emails and so he deletes them is not sufficient. The fact is that, here, there were many, many red flags that should have alerted Mr. Marks to retain emails with defendants.

First, defendants sent an email to Mr. Marks on January 25, 2021 informing him that they intended to vacate the premises on January 26, 2022 and blamed plaintiff for not negotiating in good faith about rent reductions. Next, defendants sent another message on December 8, 2021 telling Mr. Marks that they intended to follow through on their surrender in January 2022. Moreover, Mr. Marks sent an email on February 8, 2022 to representatives from defendants in which he claimed that the premises were not left in "Broome [sic] clean" condition.

**Any landlord in New York City knows that these events give reasonable notice that it is time to retain emails (and not delete them) because a dispute and possible litigation are probable. And Mr. Marks' affidavit does not detail a coherent retention policy that could justify the deletion of emails. He did not offer criteria for when he deletes emails or how he determines which emails to delete and which to save. Instead, he appears to argue that he deletes emails because he gets too many. That does not justify haphazardly deleting emails and demonstrates negligence in retaining these documents.**

The Court observes that these deleted emails are clearly relevant. Obviously, a key issue here is whether the premises were left in broom clean condition (the Court recognizes that plaintiff offers other issues with the surrender, including the fact that it allegedly did not agree to it in writing). Plaintiff cannot delete emails from that key time period and then argue that they are irrelevant or a red herring.

It may be that those emails would not shed any light about who was responsible for the conditions plaintiff complains about, but the Court cannot make that assumption. For instance, an email could have supported defendants' contention that someone else (possibly an unauthorized visitor) got access to the premises and destroyed it. And the issue of the premises' condition relates both to the good guy guaranty (and the related surrender) as well as plaintiff's demand to recover the costs it incurred to repair and clean the premises.

However, the Court finds that striking the complaint is too severe of a sanction as plaintiff has produced some documents and defendants have had the chance to depose key witnesses. **Therefore, the Court will impose an adverse inference that the deleted emails would not have supported plaintiff's position that defendants were responsible for the alleged damage to the premises.**

[* 2]

On March 28, 2024, Justice Bluth issued a decision on summary judgment which found that Tenant was liable for breach of lease, but that damages as to Tenant had to be established at trial.

As to Guarantor, Justice Bluth held that the Good Guy Guarantee did not require Landlord's consent to surrender the premises, that the premises was in "broom clean" condition to the extent required by the Guarantee, and that at the time of the surrender there was no evidence that any rent or additional rent was outstanding.

## FINDINGS OF FACT

Marks acquired the building located at 213-219 West 23rd Street, New York, New York 10017 in 2003. Marks then converted the building to condominium units. At or about the time of the conversion, Marks, through the Plaintiff entity retained possession of the two ground floor units CU-1 and CU2 ("Subject Premises"), the balance of the building was for residential units. The Subject Building was previously known as the McBurney YMCA.

The three main witnesses at trial were Marks, Karen Gold ("Gold") and Sarah Kovacs ("Kovacs"). As further detailed below, the Court found the testimony of Kovacs and Gold to be credible and found that Marks' testimony lacked credibility on key points.

In 2003, when Plaintiff purchased the Subject Premises it was "a fully built out gym for David Barton. (Ex TTT). Marks testified that he did substantial work on the gym after Barton signed the lease, but he could not recall when, and further acknowledged that David Barton was never able to obtain a temporary certificate of occupancy during the period it initially occupied the Subject Premises from 2003 to 2013. (Ex TTT). No documentary evidence was offered at

[* 3]

trial to support Marks' testimony of what work he did in connection with the first tenancy of David Barton in the space. [1]

On April 10, 2013, Tenant entered a fifteen (15) year lease (the "Lease") for the Subject Premises to use as a gym.

Guarantor executed two different guarantees. The first was a "Guaranty," which pertained only to Tenant's obligations during the first five years of the Lease. The second guarantee was entitled "Good Guy Guaranty" and is the agreement at the center of this litigation. Pursuant to the Good Guy Guaranty, Guarantor guaranteed all rent and additional rent up payable by Tenant under the Lease until the "Surrender Date."

Pursuant to the Good Guy Guaranty, Guarantor would have no further liability upon the "Surrender Date," which is defined in the Good Guy Guaranty as the date that is twelve months after Tenant provided written notice that it intends to vacate and surrender the Premises upon ensuring that Tenant (a) paid all rent and additional rent obligations; (b) vacated and surrendered the Premises free of all subleases or licensees and in broom clean condition; (c) turned over the keys; and (d) delivered a surrender letter to Landlord.

After taking the space Tenant replaced the floor tiles with its own floor tiles and replaced the lockers in the men's locker room. The men's lockers had to be replaced because they were in poor condition. The replacement was done in 2014. The tiles had to be replaced again during the term of the tenancy because of floods in 2016 and 2021 in the Subject Premises. The tiles were not glued to the floor. Kovacs' credible and unrebutted testimony was that gym floor tiles have a life span of 5 to 7 years depending on how much traffic the particular area has.

---

[1] The deposition transcript of Marks was submitted in its entirety in evidence. Marks' deposition testimony did nothing to add to his credibility as he was consistently evasive in responding to questions.

4

[* 4]

On January 25, 2021, Tenant provided Plaintiff with written notice of its intent to vacate and surrender the Premises by January 26, 2022. By January 25, 2022, Tenant had removed all its equipment, trade fixtures, and garbage from the Premises, and hired an outside cleaning service to clean on two occasions. Tenant spent $7800.00 between January 3 and 25, 2022 to have the Subject Premises professionally cleaned and remove debris form the Subject Premises (Exs G & J).

Marks testified at trial that he never consented to the early surrender in writing and that there were no circumstances under which he ever would have consented to the early surrender because he had a mortgage to pay. However, the Court notes conspicuously absent from the record is any written or oral objection by Marks evincing a lack of consent to the surrender in the one-year period between the time he received Tenant's notice and the actual surrender took place.

In December of 2021, Tenant closed the gym to its members and ceased operation.

On January 25, 2022, Gold ("Gold"), Director of Real Estate for Crunch, and Kovacs, Senior Director of Development, met Marks, to perform a walk-through of the Subject Premises. Gold provided Marks with a letter confirming Tenant's surrender of the Premises, which included the keys to the Subject Premises and confirmation that the Subject Premises was vacant and free of all tenancies. Gold and Kovacs took photos during that walk-through.

Marks testified that he did not accept the keys at the walkthrough and that Tenant still has the keys to the Subject Premises. The Court finds this testimony lacks credibility. The Court instead credits the testimony of Gold that Marks accepted the keys with the surrender letter on January 25, 2022.

5

[* 5]

As of the January 26, 2022, Surrender Date, Tenant was current on all amounts owed under the Lease. No unpaid invoices had been issued to Tenant as of that date, and there were no unpaid DOB violations. Months after the surrender, Tenant did receive a bill for some charges in March 2022 which Tenant paid.

During the walk-through, the parties observed that the Subject Premises had been vandalized. Someone had scratched and cracked mirrors, spray painted some graffiti on several walls and created two holes in walls. Neither Gold nor Kovacs knew how this damage had occurred in the hours immediately preceding the walk-through. However, they were aware – and Marks later confirmed during his deposition – that Plaintiff had repeatedly permitted multiple third parties to enter the premises over Tenant's objections. Additionally, the credible testimony at trial was that Plaintiff had repeatedly permitted multiple third parties to enter the premises over Tenant's objections.

Isam Tamimi ("Sam") a doorman and super at the building testified at trial. Sam testified that he had initially informed Marks that he had observed graffiti and other damage to the Subject Premises that had not been there before Tenant has ceased operation. Thus Marks' was likely aware of the vandalism prior to the walkthrough. Sam confirmed that no personnel from Tenant had accessed the space around the time he discovered the damage. Sam became aware of the damage because he accessed the Subject Premises as needed to use the bathrooms. The credible testimony of Kovacs was that Sam also gave access to other workmen or delivery men to use the bathrooms of the Subject Premises without Tenant's permission and over Tenant's voiced objections, including providing access to Plaintiff's vendors, who for example, left a hot water heater in the Subject Premises after the gym had closed and prior to the surrender date.

[* 6]

Kovacs also testified that Sam would open the emergency exits to the Subject premises to allow Plaintiff's vendors to come through.

Kovacs also credibly testified that Sam and/or Marks had left the door to the Subject Premises from the alleyway unlocked and that Tenant had notified Plaintiff of this in January 2022.

Given the evidence at trial, in addition to the adverse inference established by Justice Bluth, the Court finds that the vandalism of the Subject Premises, including the damage of the graffiti, cracked mirror and holes in the wall was vandalism by unknown third parties who gained access through Plaintiff or its agents. To the extent that Marks implied that Tenant or its agents intentionally vandalized the gym because they believed a competitor was coming in the Court finds said testimony wholly lacks credibility. The Court also found Marks' testimony that someone had defecated on the floor of the gym to be lacking in credibility and unsubstantiated.

In the ensuing days, Marks demanded that the entire premises be restored to the condition it was in in in 2013, including that Tenant reinstall the same rubber floor tiles, install new lockers, and repair a small sauna space that was inoperable when Tenant acquired the space in 2013. Tenant was only ever able to use it as a storage space. Barton had attempted to install the Sauna and Steam Room without proper permits which prevented Tenant from using same during its occupancy and was one of the bars to Tenant successfully obtaining a TCO. Both rooms were only used by Tenant for storage. The Court finds that Marks' testimony that the space as delivered to Tenant was in turnkey condition and ready to operate lacks credibility, as the record establishes there was no TCO in place, and the sauna and steam room could not be operated.

Ex 25 is a violation that was issued by DOB because Plaintiff in connection with the prior tenant had never obtained a certificate of occupancy for the use of the Subject Premises.

7

[* 7]

Notwithstanding same, Tenant paid the violation shortly after it was issued. The violation was still outstanding as of the date of the trial, apparently remaining uncured by Plaintiff or subsequent occupants in the years following Tenant's surrender. Kovacs' credible and unrebutted testimony was that part of the open violation for the TCO was redoing work that David Barton had done without permits.

While Marks testified in a conclusory manner that there were other violations caused by Tenant that were never paid, no evidence of either the violations or Plaintiff's alleged payment for them were offered at trial.

At Marks' request Tenant returned to the Subject Premises, after the surrender, gaiaing access through Plaintiff's agent, to attempt to clean the spray paint and patch the wall holes, and remove the mirrors. Gold and Kovacs credibly testified that Marks had specifically requested they remove the mirrors. Although they could not pinpoint how and when the request came, the Court credits this testimony.

On February 3rd, the date that this work was being done, Marks arrived at the Subject Premises and became upset with the manner in which the mirrors were being removed. Marks believed that the removal of the mirrors required DOB permits and was being improperly done with Jackhammers. There is no basis in the record to find that the work required permits. Kovacs and Gold credibly testified that jackhammers were typically used to remove mirrors glued to the walls. This testimony was unrebutted. Marks called Kovacs in a hysterical manner demanding the work stop and the workers leave. Kovacs immediately instructed her team to cease work and leave the Subject Premises. The only additional work done by the Tenant was the following day when they removed glass remnants that had been in place when Marks instructed the work cease.

8

[* 8]

On February 8, 2022, the Parties attended a final walkthrough of the Subject Premises. At the completion of the second walkthrough, Kovacs left and no one from Tenant ever returned to the Subject Premises.

Pursuant to a lease dated September 30, 2022, Plaintiff relet the Subject Premises to David Barton for use as a gym (Ex 30). The tenant entity of the lease was 215 West 23rd Holdings LLC. Barton is listed as a Managing Member.

## DISCUSSION

### *The Action is Dismissed as to CRUNCH HOLDINGS LLC*

As noted above, in her summary judgment decision Justice Bluth held that the Good Guy Guarantee did not require Plaintiff's consent to surrender the Subject Premises, that the Subject Premises was in "broom clean" condition to the extent required by the Guarantee, and that at the time of the surrender there was no evidence that any rent or additional rent was outstanding.

Even if this was not law of the case, these findings are independently borne out at trial based on the Court's findings of fact.

Based on the foregoing the action is dismissed as to the Guarantor.

### *Amount of Damages Established at Trial as to Tenant*

Plaintiff seeks damages totaling $4,231,896.02 against Tenant for unpaid rent, real estate taxes, and common area maintenance charges due under §§ 1, 42.2(a), and 42.2(c) of the Lease through April 2025.

Plaintiff also seeks $587,783.85 in repair and restoration costs due under § 3 of the Lease. Finally, Plaintiff seeks reasonably attorneys' fees and expenses against the Tenant .

Plaintiff's claim for $3,430,607.06 for rent as to Tenant is essentially uncontested.

9

[* 9]

Plaintiff seeks an additional $706,642.29 in Real Estate taxes. § 42.2(a) of the rider to the lease provides that Real Estate Taxes shall be payable within 10 days after Owner's notice to Tenant of the amount due and further provides "Promptly after the final assessed valuation and rate for the Condo Unit is fixed, Owner shall send a statement to Tenant setting forth Tenant's Share of the Real Estate Taxes, which statement shall attach a copy of the then current real estate tax bill, and Tenant shall pay to Owner the amount of Tenant's Share thereof within 30 days as Additional Rent." There is no evidence in the record that Plaintiff sent the required notice and as such judgment for Real Estate Taxes is dismissed.

Plaintiff seeks $94,646.67 for common area maintenance alleged due under § 42.2(c) of the Lease. That Section provides:

> The Common Area Maintenance charges as herein provided shall be payable within 30 days after Owner's notice to Tenant of the amount thereof due with respect to any calendar year or part thereof. Promptly after the end of each year, Owner shall send a statement to Tenant setting forth Tenant's Share of the Common Area Maintenance charges, and Tenant shall pay to Owner the amount of Tenant's Share thereof within 10 days as Additional Rent.

There is no evidence that any such notices were provided to Tenant as such the claim for common charges is dismissed.

Plaintiff seeks an additional s $587,783.85. for alleged repair and restoration of the Subject Premises. Plaintiff provides the following breakdown for these charges:

| | |
|---|---|
| Replace hot water tank | $ 8,891.07 |
| Replace lighting throughout the Premises Focus Lighting | $ 153,569.28 |
| Repair damaged fire panel; bring panel up to code; replace wire for cameras that were cut and/or damaged | $ 14,857.36 |
| Replace mirrors throughout the Premises | $ 92,395.43 |
| Replace gym rubber tile flooring | $ 69,745.13 |

10

[* 10]

| Replace steam room equipment | $ 13,875.29 |
| Replace lockers | $ 110,000.00 |
| Replace sound and acoustic equipment | $ 49,960.29 |
| Labor costs associated with repair and restoration work | $ 74,490.00 |

The Court finds no basis in the record to assess Tenant for any of these alleged restoration costs, other than replacement of the men's room lockers. However, as to the lockers and the balance of costs asserted the Court finds the record is devoid of sufficient evidence that Plaintiff incurred any of these costs. The documentation submitted in support of the claim consists primarily of proposals submitted to David Barton for work. No proof of payment was submitted, either by Barton or Plaintiff. Additionally, Marks' testimony at trial appeared to be that he had invested money with Barton and become a partner and that this was the basis of his claim for restoration costs.

Based on the foregoing, the claim for restoration costs is dismissed.

The Court does find that Plaintiff is entitled to an award of attorneys' fees as against Tenant pursuant to the lease.

The Court further finds that Plaintiff is entitled to dismissal of Tenant's counterclaim for breach of quite enjoyment as there is nothing in the record by Tenant substantiating any damages for said claim.

## CONCLUSION

WHEREFORE it is hereby:

ORDERED the action is dismissed in its entirety as against CRUNCH HOLDINGS LLC, with costs and disbursements to said defendant as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly in favor of said defendant; and it is further

11

[* 11]

ORDERED that Clerk is directed to enter judgment in favor of 213 WEST 23RD STREET LLC against CRUNCH WEST 23RD STREET, LLC in the amount of $3,430,607.06 plus statutory interest as calculated by the Clerk of the Court from March 29, 2024, as well as costs and disbursements as taxed by the Clerk of the Court; and it is further

ORDERED that Plaintiff is entitled to reasonable attorneys' fees as against Tenant. A determination of the amount of said fees shall be held in abeyance until any appeals from this order have been determined or the time to appeal has expired; and it is further

ORDERED that Tenant's Counterclaim for breach of quiet enjoyment is dismissed.

This constitutes the decision and order of the Court.

202504251240 10SBKRAUSEB 9899E245E40B5BF93A0F3F63F61CA

**DATE: 4/25/2025**

**SABRINA KRAUS, JSC**

**Check One:**  **X**  **Case Disposed**    **Non-Final Disposition**

**Check if Appropriate:**    **Other (Specify**                                          **)**

12

[* 12]